**UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE: THE HONORABLE CLAIRE R. KELLY**

| | |
|---|---|
| ————————————————————————x : | |
| GARG TUBE EXPORT LLP AND GARG TUBE LIMITED, : : | |
| Plaintiffs, : : | |
| : | Court No. 21-00169 |
| v. : : | **PUBLIC VERSION** |
| UNITED STATES, : : | |
| Defendant, : : | |
| and : : | |
| NUCOR TUBULAR PRODUCTS INC. and WHEATLAND TUBE, : : | |
| Defendant-Intervenors. : | |
| ————————————————————————x | |

## PLAINTIFFS' MOTION FOR JUDGMENT ON THE AGENCY RECORD AND COMMENTS ON REMAND REDETERMINATION

Pursuant to Rule 56.2 of the Rules of the U.S. Court of International Trade, Plaintiffs

Garg Tube Export LLP and Garg Tube Limited (collectively, "Garg") respectfully move for

judgment on the administrative record. For the reasons set forth in the accompanying brief in

support of its motion and comments regarding the U.S. Department of Commerce's Final Results

of Redetermination Pursuant to Court Remand, filed by Defendant United States on March 20,

2023, ECF 42-2 ("Remand"), Garg requests that this Court determine that the U.S. Department

of Commerce's final determinations in *Welded Carbon Steel Standard Pipes and Tubes from*

*India: Final Results of Antidumping Duty Administrative Review; 2018-2019*, 86 Fed. Reg.

14,872 (Mar. 19, 2021) and its Remand are not supported by substantial evidence on the record and are otherwise not in accordance with law.

Respectfully submitted,

GRUNFELD, DESIDERIO, LEBOWITZ, SILVERMAN & KLESTADT LLP

*/s/ Ned H. Marshak*
Ned H. Marshak
Dharmendra N. Choudhary
Jordan C. Kahn

GRUNFELD, DESIDERIO, LEBOWITZ, SILVERMAN & KLESTADT LLP

599 Lexington Ave., 36th Floor
New York, New York 10022
(212) 557-4000
**
1201 New York Ave., NW, Suite 650
Washington, DC 20005
(202) 783-6881

*Counsel for Plaintiffs Garg Tube Export LLP and Garg Tube Limited*

Dated: July 31, 2023

## UNITED STATES COURT OF INTERNATIONAL TRADE

### BEFORE: THE HONORABLE CLAIRE R. KELLY

————————————————————— x
                                     :

GARG TUBE EXPORT LLP AND GARG     :
TUBE LIMITED,                                 :
                                       :
         Plaintiffs,                  :
                                       :
                                       :     Court No. 21-00169
     v.                             :
                                       :
                                       :     **PUBLIC VERSION**

UNITED STATES,                         :
                                       :
         Defendant,             :
                                       :
         and                            :
                                       :
NUCOR TUBULAR PRODUCTS INC. and     :
WHEATLAND TUBE,                     :
                                       :
         Defendant-Intervenors.     :
————————————————————— x

### MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR JUDGMENT ON THE AGENCY RECORD AND PLAINTIFFS' COMMENTS ON COMMERCE'S REMAND REDETERMINATION

Ned H. Marshak
Dharmendra N. Choudhary
Jordan C. Kahn

GRUNFELD, DESIDERIO, LEBOWITZ,
SILVERMAN & KLESTADT LLP

599 Lexington Ave., 36th Floor
New York, New York 10022
(212) 557-4000
**
1201 New York Ave., NW, Suite 650
Washington, DC 20005
(202) 783-6881

*Counsel for Plaintiffs Garg Tube
Export LLP and Garg Tube Limited*

Dated: July 31, 2023

## **TABLE OF CONTENTS**

I.    STATEMENT PURSUANT TO RULE 56.2 ................................................................. 1

II.   ISSUES OF LAW PRESENTED AND SUMMARY OF ARGUMENT.............................. 1

   A.   WHETHER COMMERCE'S APPLICATION OF PARTIAL AFA WAS LAWFUL? ..... 1

   B.   WHETHER COMMERCE'S DIFFERENTIAL PRICING METHODOLOGY WAS
        LAWFUL? ........................................................................................................... 2

III.  REASONS FOR CONTESTING THE DETERMINATION ................................................. 3

IV.   STANDARD OF REVIEW............................................................................................. 3

V.    STATEMENT OF FACTS ............................................................................................. 4

   A.   AR18-19............................................................................................................. 4

   B.   THIS APPEAL AND REMAND PROCEEDINGS ........................................................ 16

VI.   ARGUMENT ............................................................................................................ 18

   A.   COMMERCE UNLAWFULLY APPLIED PARTIAL AFA TO GARG BECAUSE OF
        [          ] FAILURE TO RESPOND TO COMMERCE'S QUESTIONNAIRE .......... 18

      1.   The AR17-18 Litigation................................................................................. 18

      2.   This Court Should Follow Its AR17/18 Precedent ....................................... 23

   B.   THE REMAND IMPROPERLY EMPLOYED COMMERCE'S DIFFERENTIAL
        PRICING METHODOLOGY ................................................................................... 28

      1.   Commerce Failed to Show that Garg's U.S. Sales Satisfy the Statutory Criteria for
        Applying the Cohen's *d* Test ....................................................................... 28

      2.   Garg Exhausted its Administrative Remedies by Challenging Differential Pricing in the
        Draft Remand ............................................................................................... 32

      3.   Commerce's Method for Determining the Denominator in the Cohen's *d* Test Is
        Unreasonable and Unsupported by Substantial Evidence .......................... 35

VII. CONCLUSION .......................................................................................................... 37

PUBLIC VERSION

## **TABLE OF AUTHORITIES**

**Cases**

*Agro Dutch Indus. Ltd. v. United States*, 508 F.3d 1024 (Fed. Cir. 2007) .................................. 34

*Apex Frozen Foods Priv. Ltd. v. United States*, 862 F.3d 1337 (Fed. Cir. 2017) ........................ 33

*Canadian Solar Int'l Ltd.  v. United States,* 378 F. Supp. 3d 1292 (CIT 2019) ......................... 25

*Canadian Solar Int'l Ltd. v. United States*, 415 F. Supp. 3d 1326 (CIT 2019) ........................... 25

*Consol. Edison Co. v. NLRB*, 305 U.S. 197 (1938) .......................................................................... 3

*Dillinger France S.A. v. United States*, 981 F.3d 1318 (Fed. Cir. 2020) .................................... 33

*Garg Tube Export LLP v. United States*, 527 F. Supp. 3d 1362 (CIT 2021) ........................ passim

*Garg Tube Export LLP v. United States*, 569 F. Supp. 3d 1202 (CIT 2022) .............. 2, 23, 26, 27

*Gerald Metals, Inc. v. United States*, 132 F.3d 716 (Fed. Cir. 1997) ..................................... 3, 35

*Itochu Bldg. Prod. v. United States,* 733 F.3d 1140 (Fed. Cir. 2013) .......................................... 34

*Itochu Bldg. Prods. Co. v. United States*, 2018 WL 1445676 (CIT Mar. 22, 2018) ................... 25

*Itochu Building Products Co. v. United States*, 2017 WL 2703810 (CIT June 22, 2017) ........... 25

*Marmen Inc. v. United States*, 627 F. Supp. 3d 1312 (CIT 2023) ................................................ 32

*Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927 (Fed. Cir. 1984) .............................. 3

*Mid Continent Steel & Wire, Inc. v. United States*, 31 F.4th 1367 (Fed. Cir. 2022) .............. 35, 36

*Mid Continent Steel & Wire, Inc. v. United States*, 628 F. Supp. 3d 1316 (CIT 2023) ............... 36

*Mittal Steel Point Lisas Ltd. v. United States*, 548 F.3d 1375 (Fed. Cir. 2008) .......................... 33

*Motor Vehicle Mfgrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) .............. 4, 35

*Mueller Commercial de Mexico, S. de R.L. de C.V. v. United States,*  753 F.3d 1227
   (Fed. Cir. 2014) ...................................................................................................................... passim

*Nexteel Co. v. United States*, 633 F. Supp. 3d 1190 (CIT 2023) ............................................ 31, 32

*Papierfabrik Aug. Koehler AG v. United States,* 36 CIT 1632 (2012) ........................................ 34

*Risen Energy Co. v. United States*, 611 F. Supp. 3d 1384 (CIT 2022) ........................................ 24

*SeAH Steel Corp. v. United States,*  2023 WL 3244018 (Fed. Cir. May 4, 2023) ....................... 32

*SeAH Steel Corp. v. United States*, 2023 WL 3316548 (Fed. Cir. May 9, 2023) ........................ 32

*SeAH Steel Corp. v. United States,*  619 F. Supp. 3d 1309 (CIT 2023) ...................................... 32

*Siemens Gamesa Renewable Energy v. United States*, 621 F. Supp. 3d 1337 (CIT 2023) ......... 34

*SKF USA Inc. v. United States*, 630 F.3d 1365 (Fed. Cir. 2011) ................................................. 25

*SolarWorld Ams., Inc. v. United States*, 234 F. Supp. 3d 1286 (CIT 2017) .............................. 26

*Stupp Corp. v. United States,* 5 F.4th 1341 (Fed. Cir. 2021) ................................................ passim

*Stupp Corp. v. United States,*  619 F. Supp. 3d 1314 (CIT 2023) .............................................. 29

*Venus Wire Indus. Pvt. Ltd. v. United States*, 471 F. Supp. 3d 1289 (CIT 2020) ....................... 24

**Statutes**

19 U.S.C. § 1516a ............................................................................................................................ 3

19 U.S.C. § 1675 .......................................................................................................................... 34

19 U.S.C. § 1677 ..................................................................................................................... 3, 23

19 U.S.C. § 1677e ..................................................................................................................... passim

19 U.S.C. § 1677f-1 ................................................................................................................. 28, 29

**Regulations**

19 C.F.R. § 351.302 ..................................................................................................................... 10

19 C.F.R. § 351.414 ..................................................................................................................... 28

ii

**Federal Register Notices**

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China*, 77 Fed. Reg. 63,791 (Oct. 17, 2012) (final determination)......... 26

*Welded Carbon Steel Standard Pipes and Tubes from India: Notice of Court Decision Not in Harmony with the Final Results of Antidumping Administrative Review; Notice of Amended Final Results*, 87 Fed. Reg. 65,749 (Nov. 1, 2022) ............................................................... 17

*Welded Carbon Steel Standard Pipes and Tubes from India*, 86 Fed. Reg. 14,872 (Mar. 19, 2021) (*Final Results*)................................................................................................................. passim

*Welded Carbon Steel Standard Pipes and Tubes from India: Final Results of Antidumping Duty Administrative Review; 2017/18*, 85 Fed. Reg. 2715 (Jan. 16, 2020)....................................... 18

*Welded Carbon Steel Standard Pipes and Tubes from India: Preliminary Results of Antidumping Duty Administrative Review; 2018-2019*, 85 Fed. Reg. 44,860 (July 24, 2020) ..................... 11

**Other Authorities**

Jacob Cohen, *Statistical Power Analysis for the Behavioral Sciences* (2d ed. 1988) ............ 30, 31

Johnson Ching-Hong Li, *Effect size measures in a two-independent-samples case with nonnormal and nonhomogenous data*, 48 Behavioral Research 1560 (2d ed. 2012) ............... 31

Robert J. Grissom & John J. Kim, *Effect Sizes for Research*: *Univariate and Multivariate* (2d ed. 2012) ........................................................................................................................... 30

Plaintiffs Garg Tube Export LLP ("GTEL") and Garg Tube Limited ("GTL") (collectively, "Garg") submit this Brief to support their Motion for Judgment on the Agency Record.

## I.   STATEMENT PURSUANT TO RULE 56.2

This is an appeal from the U.S. Department of Commerce's ("Commerce" or the "Department") final determination in the 2018-19 administrative review ("AR18/19") of the antidumping duty ("ADD") order on *Welded Carbon Steel Standard Pipes and Tubes from India*, 86 Fed. Reg. 14,872 (Mar. 19, 2021), P.R. 238 ("*Final Results*"), as amended by the Final Results of Redetermination Pursuant to Court Remand, filed by Defendant United States on March 20, 2023, ECF 42-2, P.R.R. 4 ("Remand"). The *Final Results* cover the period of review ("POR") from May 1, 2018, to April 30, 2019. The challenged determinations, findings, and conclusions as to whether Commerce's application of adverse facts available ("AFA") are found in Commerce's accompanying Issues and Decision Memorandum (Mar. 15, 2020), P.R. 235 ("IDM"). The challenged determination as to whether Commerce's differential pricing analysis was contrary to law are found in the Remand.

## II.   ISSUES OF LAW PRESENTED AND SUMMARY OF ARGUMENT

### A.   WHETHER COMMERCE'S APPLICATION OF PARTIAL AFA WAS LAWFUL?

**No.** Commerce calculated the costs of inputs provided to Garg by its unaffiliated vendor, [                              ] based on AFA. Garg fully co-operated in this proceeding. It repeatedly asked [      ] to submit cost data to Commerce, and advised [      ] that its refusal to provide the data would threaten the relationship. [      ] did not reply. [      ] also did not respond to a questionnaire transmitted by Commerce directly to [      ]. In its IDM, Commerce expressly held that its decision to rely on AFA was based on [      ] failure to reply to

Commerce's questionnaire, rather than Garg's failure to submit the data. Yet, as the same time, Commerce reasoned that Garg failed to put forth its maximum efforts in inducing [      ] to cooperate. Commerce's IDM also repeatedly noted that its decision in AR18/19 was based on the identical rationale as its decision in the immediately preceding annual review coving the POR from May 1, 2017, to April 30, 2018 ("AR17/18"). The AR17/18 decision was remanded for further analysis by this Court in *Garg Tube Export LLP v. United States*, 527 F. Supp. 3d 1362, 1373-74 (CIT 2021) ("*Garg I*"). On remand, Commerce reversed its decision to calculate [      ] costs based on AFA, and instead relied on [      ] sales price to Garg to calculate these costs. *Final Results of Redetermination Pursuant to Court Remand* (Oct. 4, 2021), Court No. 20-26, ECF 73 at 3 ("*AR17/18 Redetermination*"). This Court affirmed Commerce's decision. *Garg Tube Export LLP v. United States*, 569 F. Supp. 3d 1202, 1221 (CIT 2022) ("*Garg II*").

Following its decision in *Garg I,* this Court should remand the *Final Results* for further analysis. In its Remand Order, this Court should instruct Commerce to follow the same rationale upon which Commerce relied in its *AR17/18 Redetermination* (that is, to calculate [      ] costs based on [      ] sales price to Garg), or provide justification as to why a different conclusion is warranted in this case.

### B.   WHETHER COMMERCE'S DIFFERENTIAL PRICING METHODOLOGY WAS LAWFUL?

**No.** Commerce's reliance on the Cohen's *d* test to determine whether Garg engaged in targeted dumping during AR18/19 was contrary to law, insofar as Commerce did not consider the analysis required by the Court of Appeals for the Federal Circuit ("Federal Circuit" or "CAFC") in *Stupp Corp. v. United States,* 5 F.4th 1341, 1351-52 (Fed. Cir. 2021) in reaching its

conclusion. *Stupp* requires that Commerce conclude that reliance on Cohen's *d* is contrary to law.

Commerce abused its discretion by refusing to consider Garg's Cohen's *d* claim on redetermination, claiming that Garg had failed to exhaust its administrative remedies. By relying on Cohen's *d* to recalculate Garg's ADD rate on remand, Commerce subjected Cohen's *d* to judicial review irrespective of whether it had earlier been challenged during Commerce's initial determination. Moreover, since *Stupp* was decided on July 15, 2021, after Garg filed its Summons and Complaint in this AR18/19 litigation, this case falls squarely within the futility, question of law, and intervening judicial decision changing the law exceptions to the exhaustion doctrine.

## III.    REASONS FOR CONTESTING THE DETERMINATION

Garg's reasons for contesting the *Final Results* and Remand are set out below.

## IV.    STANDARD OF REVIEW

This Court must hold unlawful any aspect of Commerce's final determination that is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 217 (1938); *Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984). Substantial evidence requires more than mere assertion of "evidence which in and of itself justified {the determination}, without taking into account contradictory evidence or evidence from which conflicting inferences could be drawn." *Gerald Metals, Inc. v. United States*, 132 F.3d 716, 720 (Fed. Cir. 1997) (quotation omitted). For decisions to be supported by substantial evidence, Commerce may not base that determination "on the basis of mere conjecture or supposition." 19 U.S.C. § 1677(7)(F)(ii). Commerce, as any agency, must "cogently explain why

it has exercised its discretion in a given manner." *Motor Vehicle Mfgrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 48 (1983).

## V.    STATEMENT OF FACTS

### A.    AR18-19

Commerce initiated AR18/19 on July 15, 2019, P.R. 12, after its receipt of timely filed review requests from Garg, P.R. 2, and two domestic producers, Defendant-Intervenors Wheatland Tube, P.R. 1, and Nucor Tubular Products Inc., P.R. 3. On October 10, 2019, Garg filed its Section A Questionnaire Response C.R. 5-8, P.R. 38-41 ("AQR").[1] [      ] was identified as an unaffiliated Indian company from whom Garg purchased carbon steel welded pipe, which Garg transformed into subject merchandise or sold as-is. *Id.* at Exhibit 14.[2]

On November 12, 2019, Garg filed its Sections B (home market sales), C (U.S. sales) and D (constructed value ("CV") and cost of production ("COP")) Questionnaire Responses. *See* Garg Sections B-D Questionnaire Response (Nov. 12, 2019), C.R. 10-11, P.R. 56-57 ("BCDQR"). In Revised Exhibit A-14, Garg again identified [      ] as an unaffiliated Indian company from whom Garg purchased carbon steel welded pipe, which Garg transformed into subject merchandise or sold as-is. *Id.* at Revised Exhibit A-14. In its Section B response to Field

---

[1] As explained to Commerce, Garg consists of two affiliated companies, Garg Tube Export LLP ("GTEL") and Garg Tube Limited ("GTL"), which produce subject merchandise. AQR at A-1. Garg's response to Commerce included all requested data for both companies. For the purpose of this Brief, GTL and GTEL are referred to as Garg. Both GTL and GTEL purchased pipe from [      ] and Commerce applied partial AFA to purchases by GTL and GTEL. Also, Garg submitted consolidated data for GTL and GTEL and Commerce calculated one weighted average ADD margin for both companies.

[2] Commerce relied on partial AFA to calculate the cost of production of two other unaffiliated vendors from whom Garg purchased pipe, which it sold as-is: [
        ]. Preliminary Analysis Memo at 6. Garg is not pursuing its claim regarding data; thus, this Brief only discusses Commerce's AFA application to pipe purchased from [      ].

No. 41, Manufacturer, Garg identified [      ] as one of several companies which fell into the

following categories.

> Further as explained at page A-36-38 of GTEL/GTL's Section A response,
> apart from selling its own produced welded pipes from hot rolled coils, GTL
> has further manufactured galvanized pipe from non-galvanized pipe purchased
> from un- affiliated Indian producers. Such further manufactured galvanized pipe
> from non-galvanized pipe purchased from un-affiliate Indian producers is
> considered by GTL as own produced subject merchandise and identified as
> "GTL" in this field.
>
> Further GTEL has sold non-galvanized welded pipes and galvanized welded
> pipe purchased from un-affiliate Indian producers (as listed in Exhibit A-14 of
> its Section A response) <u>as it is</u> in the home market. Based on heat/batch
> number/purchase invoices, GTL is able to track the origin of the pipe sold.
> These <u>as it is</u> sales of non-galvanized and galvanized welded pipe have been
> included in the home market  sale data base and identified as follows

*Id.* at B-43. An identical discussion of the role of unaffiliated manufacturers, including [      ] for

U.S. sales is found in Garg's Section C Questionnaire Response to Field No. 59.0, Manufacturer.

*Id*. at C-50–51.

In Section D, in response to Commerce's question as to how Garg should report direct

material costs, Garg advised as follows:

> For HR coil consumption cost, based on the above tracking mechanism if
> Production quantity is out of HRC then Garg Tube has allocated the HRC
> consumption cost to those production quantities to reflect producer/supplier
> specific material cost.
>
> For purchased pipes, Direct Material - MS Pipe and Direct Material - GI Pipe cost
> fields Garg Tube has provided supplier-specific acquisition costs. Thus, for
> example, if the manufacturer is identified as "[      ]" then Garg Tube has
> provided a yielded pipe cost that is based on the purchase prices paid to [      ]
> during the CRP.

*Id.* at D-29.

At Exhibit D-8a, Garg submitted precise, CONNUM specific data as to the source, cost

and quantity of material used in production, including inputs purchase from [      ]. *Id.* at

Exhibit D-8a; *see id.* Exhibits D-8b, D-8c, and D-8d. Then, in its cost reconciliation, Exhibit D-

16a, Garg reported the producer (including [      ], where applicable), quantity purchased, and weighted average purchase price for material inputs. *Id.* Exhibit D-16a; *see id.* Exhibit D-16b. These data allowed Commerce to compare, on a CONNUM specific basis, the quantity (column C, in MT) and average unit cost (column D, TOTOCOM, in Rs/MT) of pipes produced in house by Garg with pipes purchased from [      ], and sold, as is. Similar analyses could be conducted by reviewing the data in Exhibits D-19-20.

On December 19, 2019, Commerce sent a supplemental questionnaire to Garg, asking questions relating to its Section A-D Questionnaire Responses. Garg Supplemental Questionnaire (Dec. 20, 2019), C.R. 35, P.R. 94. The questionnaire included a request that Garg submit [      ] cost of production data.

> 5.  For the non-galvanized pipes and tubes that you purchased from the suppliers listed below and either processed into galvanized pipes and tubes or re-sold as is, please obtain the actual costs of production (*i.e.*, the supplier's materials labor, overhead, general and administrative expenses, and financing expenses) from these suppliers:
>
>> GTEL (*See* section A response at 37 and Exhibit A-14, Part 1)
>> [                    ]
>
>> Provide in your cost build-ups additional columns that reflect these suppliers' actual costs, where applicable.  Distinguish in your final cost database direct material costs reflective of the acquisition costs, as you have reported already, from direct material costs based on these suppliers' actual cost of production that we herein request you to provide.
>
>> Please have each of these suppliers respond to Item 2 (Corporation Structure and Affiliations) and Item 6 (Accounting/ Financial Practices) in section A of the original questionnaire and to all items of section D of the original questionnaire and provide their respective costs on a control-number-specific basis.
>
>> **The suppliers in question may either provide their responses to you for submission or they may submit their responses to Commerce directly in ACCESS following the same filing instructions in the original questionnaire.**  The suppliers' cost responses are due at the deadline for your response to this supplemental questionnaire, which we established in the cover letter of this supplemental questionnaire.

*Id*. at 12-13.

Garg responded to this request on January 23, 2020. Garg First Supplemental

Questionnaire Response (Jan. 23, 2020), C.R. 36-46, P.R. 119-27 ("SQR").[3] Garg stated:

> In order to obtain the actual cost of production of pipes (both unfinished and finished) purchased from [                              ], [
> ] and [                              ] (pursuant to Item 2 and Item 6 of Section A & section D), Garg Tube has made extensive efforts over the past few weeks.
>
> Garg Tube had made several dialogues with its senior management over phone call, wherein Garg Tube explained in detail the acute necessity to provide the specific CONNUM wise cost of production data and relevant company information. Garg Tube also communicated with all the [      ] supplier through emails, further elaborating its requirements. **Exhibit-S1-D-5(a) to Exhibit S1-D-5(c)** contains copies of all of the emails exchanged with, [      ], [      ] & [      ]. It may be noted that, the circumstances of this issue is exactly same as was in in the last admin review in which Department has asked [      ] and [      ] to respond but none of these supplier provide any data to Garg Tube. Although, Garg Tube did its utmost to persuade all the supplier to provide the data. But none of these suppliers provided any data nor replied to any of the email communicated by Garg Tube.
>
> In view of the above facts, the Department should excuse the reporting of cost data by [                ]. Indeed, similar fact patterns in several other administrative reviews led the Department to excuse cooperative mandatory respondents from reporting factors of production (FOPs) for their unaffiliated uncooperative suppliers and instead apply as facts available the FOP data of the cooperative respondent or other cooperative tollers.

SQR at 38-39.

> Garg continued:

- Garg Tube's supplier, [                ], lacks prior experience, institutional capacity and business motivation (it has no direct exports to USA) to cooperate with Commerce's extensive cost data requirement.

- Applying AFA to Garg Tube won't have any direct adverse effect on supplier, since it does not have any direct business with the USA.

- Garg Tube has insufficient leverage over [                ].

- Garg Tube has provided all evidence of all of its communications with [                ].

---

[3]    This document is mislabeled as Garg's BCDQR when, in fact, it is Garg's SQR.

PUBLIC VERSION

*Id*. at 41.

Exhibit-S1-D-5(a) to Exhibit S1-D-5(c) contained emails from Garg to multiple vendors requesting cost data. Garg sent the following email to [      ] on [                    ].

[

]

*Id*. Exhibit S-1-D5(b).

On [                ] Garg renewed its request:

[

]

*Id*.

On [                ] Garg sent a third email to [      ].

[

]

We have business relationship with you and your refusal to provide the data either to us or directly could affect our U.S. business and consequently our relationship.

8

> Awaiting your quick reply as deadline to submit the response to US DOC is approaching.

*Id*.

Garg's supplemental Section D response also included CONNUM specific worksheets for CONNUMs in which pipe was both self-produced by Garg, and sold as-is from pipe purchased from unaffiliated vendors, including [      ]. SQR Exhibits S-1-14(a)-(b). A worksheet showing inventory movement data for GTEL was attached as SQR Exhibit S1-D-2(e). Inventory movement data for GTL were found in Exhibit S1-D-2(f). These worksheets showed the quantity and value of pipe purchased from [      ] and other unaffiliated vendors during AR18/19 and the pipe self-produced by GTEL and GTL from coil. For example, GTEL purchased [        ] of coil during AR18/19 (which it used to produce pipe) compared to [        ] pipe purchased from [      ]. *Id*. GTL purchased [        ] of coil, compared to [      ] of pipe purchased from [      ]. Exhibit S-1-D6(a) revised Exhibit A-14. Exhibit S1-D-10(a) consisted of a list of CONNUMs in which Garg purchased pipe from unaffiliated vendors (including [      ]) during AR18/19, but did not itself produce subject pipe. *Id.* Merely [   ] CONNUMs consisted of merchandise purchased from [      ] which also was not produced by Garg. Overall, Garg reported [    ] CONNUMs in its Section D database. *See* BCDQR Exhibit 20(b).

Five month later, on May 5, 2020, Commerce sent a questionnaire directly to [      ], requesting that [    ] respond to Sections A and D of Commerce's Questionnaire by May 29, 2020. [      ] Questionnaire (May 5, 2020), C.R. 49, P.R. 137. Commerce stated:

> To assist us in this matter, we require that you respond to the Commerce's sections A and D of the antidumping duty questionnaire. Based on the requirements of the law and our examination of the record, we request that you provide the necessary cost information for pipes and tubes you produced and sold to Garg Tube during the period of review. The period of review is May 1, 2018, through April 30, 2019. **Your reporting of cost information must be specific to each unique control number, or CONNUM, and based on theoretical weight.**

> We encourage you to coordinate closely with Garg Tube to ensure that your
> reporting of cost in this regard is accurate.

*Id*. at Cover Letter (emphasis added) (footnote omitted). Commerce continued:

> If we do not receive either the requested information or a written extension
> request before 5:00 p.m. ET on the established deadline, we may conclude that
> your company has decided not to cooperate in this proceeding. Commerce will
> not accept any requested information submitted after the deadline. As required by
> 19 CFR 351.302(d), we will reject such submissions as untimely. Therefore,
> failure to properly request extensions for all or part of a questionnaire response
> may result in the application of partial or total facts available, pursuant to section
> 776(a) of the Act, which may include adverse inferences, pursuant to section
> 776(b) of the Act.

*Id*.

In this questionnaire Commerce did not advise [      ] as to the practical impact of its

failure to respond; as noted, it merely stated that Commerce may apply an adverse inference if

[     ] did not reply to the questionnaire by the deadline. This letter is the only communication

between [      ] and Commerce listed in the Administrative Record. Thus, Commerce did not

provide [     ] with a second chance to respond, or otherwise advise [      ] as to the meaning

and impact of an adverse inference, after Commerce did not receive a response by the May 29,

2020 deadline.

On May 12, 2020, Commerce sent a second supplemental questionnaire to Garg that did

not request that Garg obtain cost data from [      ]. Second Supplemental Questionnaire (May 12,

2020), C.R. 51, P.R. 139. Garg responded to this questionnaire on June 9, 2020, C.R. 64-71, P.R.

160-68, and June 16, 2020, C.R. 71-75, P.R. 172-76.

On June 23, 2020, Commerce sent a third supplemental questionnaire to Garg. *See* Garg

Third Supplemental Questionnaire (June 24, 2020), C.R. 77, P.R. 180. This questionnaire did not

request that Garg obtain cost data from [      ]. Garg replied to the June 23, 2020 questionnaire

on July 2, 2020. *See* Garg Third Supplemental Questionnaire Response (July 7, 2020), C.R. 78-

79, P.R. 183-84.

Commerce issued its preliminary decision on July 21, 2020. *Certain Welded Carbon Steel Standard Pipes and Tubes from India: Preliminary Results of Antidumping Duty Administrative Review; 2018-2019*, 85 Fed. Reg. 44,860 (July 24, 2020), P.R. 202 ("*Preliminary Results*"), accompanying Decision Memorandum (July 20, 2020), P.R. 193. Commerce calculated an 8.42 percent margin for Garg. *Preliminary Results*, 85 Fed. Reg. at 44,860. In this decision, Commerce applied partial adverse available because [      ] had not reported its cost of production. Commerce reasoned:

> In situations where a respondent purchases subject merchandise from an unaffiliated producer, if: (1) the producer knew or should have known that the merchandise is going to the United States, and (2) the sales of the merchandise can be identified as to the original manufacturer (*i.e.*, not commingled), then we may exclude the sales from the U.S. data because these U.S. sales are properly attributed to the producer and not the respondent.  In this review, Garg Tube reported that its unaffiliated suppliers did not have knowledge of the ultimate destination of pipe and tube that they sold to Garg Tube. As a result, Commerce finds that Garg Tube is the first party in the transaction chain with knowledge of the U.S. destination of the subject merchandise, and, thus, is treating sales of the foreign like product and subject merchandise produced by Garg Tube's unaffiliated suppliers as sales attributable to Garg Tube.

> Although the comparison and U.S. market sales are attributable to Garg Tube, the statute requires that we obtain COP information for the subject merchandise and the foreign like product, which includes those produced from Garg Tube's unaffiliated suppliers, because they are the producers of the foreign like product and the subject merchandise under section 771(9)(A) of the Act.  Garg Tube sourced pipes and tubes from a number of domestic producers of in-scope merchandise.  Commerce requested that Garg Tube obtain the COP information from certain unaffiliated suppliers, and also subsequently issued direct requests to the same suppliers to provide the information concerning the merchandise they sold to Garg Tube. However, the suppliers in question refused to provide their COP information despite Garg Tube's repeated requests, and also did not respond to our direct requests for this information. Thus, we find that the record is missing cost information for pipe and tube produced by these certain unaffiliated suppliers and sold by Garg Tube during the POR.

> Section 776(a) of the Act provides that Commerce, subject to section 782(d) of the Act, will apply "facts otherwise available" if necessary information is not available on the record or an interested party: (1) withholds information that has been requested by Commerce; (2) fails to provide such information within the deadlines established, or in the form or manner requested by Commerce, subject to section 782(c)(1) and (e) of the Act; (3) significantly impedes a proceeding; or

11

(4) provides such information, but the information cannot be verified. Additionally, section 776(b) of the Act provides that if Commerce finds that an interested party failed to cooperate by not acting to the best of its ability to comply with a request for information, Commerce may use an adverse inference to the interests of that party in selecting the facts otherwise available.

We find that the unaffiliated suppliers in question are interested parties to this review within the meaning of section 771(9)(A) of the Act because they are producers of pipe and tube, which is the merchandise subject to the *Order*. As an initial matter, we find that necessary information is missing from the record pursuant to section 776(a)(1) of the Act, namely, these unaffiliated suppliers' respective cost information. In addition, and given that these suppliers did not provide the cost information at issue by choice, we find that each of them withheld information that was requested by Commerce, failed to provide such information within our deadline, and significantly impeded the review, pursuant to section 776(a)(2)(A)-(C) of the Act, respectively. Furthermore, we find that the suppliers in question, as interested parties to this review, failed to cooperate to the best of their ability in responding to Commerce's requests for information, given that they refused to provide the cost information on two separate occasions. Therefore, we find it appropriate to resort to partial facts available with adverse inferences regarding said suppliers' missing cost information, pursuant to section 776(b) of the Act.

In the last administrative review, as partial adverse facts available, we calculated surrogate costs for the uncooperative unaffiliated suppliers' pipes and tubes based on Garg Tube's acquisition costs for the supplier-produced pipes and tubes plus amounts for Garg Tube's further processing expenses, general and administrative expenses, and financial expenses, adjusted based on Garg Tube's home market sale on which it realized the largest loss. We applied this methodology to induce cooperation from unaffiliated suppliers of in-scope merchandise of which we requested cost information. In this administrative review, even after we applied this methodology as partial adverse facts available in the prior review, unaffiliated suppliers continue to fail to cooperate with our request for information.

Therefore, in this administrative review, as partial adverse facts available, we have used the production cost data for the product control number with the highest calculated COP as partial AFA for the missing cost data for these unaffiliated suppliers' pipes and tubes. We find that this approach results in an appropriate rate for Garg Tube because it is applied to the missing cost information, it relies upon the cost data provided by Garg Tube, and it provides a stronger inducement for future cooperation from these unaffiliated suppliers. We find that this approach yields an estimated COP for these unaffiliated suppliers in question and prevents the use of an acquisition price which may not be reflective of these suppliers' COP of in-scope merchandise.

In addition to resulting in an appropriate rate, we find that our approach potentially induces the cooperation of Garg Tube's suppliers in future segments of this proceeding, if any, and induces Garg Tube in future segments to source from

producers of subject merchandise that will cooperate in these proceedings by
providing necessary information to Commerce. We recognize that the use of this
information indirectly affects the overall dumping margin assigned to Garg Tube.
However, we believe that our approach, on balance, is consistent with our
statutory and regulatory obligations to ensure an appropriate result, while bearing
in mind the need for inducement measures in situations where the same interested
parties have continued to be uncooperative in these proceedings.

*Id*. at 9-11 (footnotes omitted).

In its Preliminary Analysis Memorandum, dated July 20, 2020, Commerce further

discussed its decision:

As explained in the Preliminary Decision Memorandum, we relied on partial
adverse facts available (AFA) to recalculate the total cost of production, the total
cost of manufacturing, and the variable cost of manufacturing of certain of Garg
Tube's unaffiliated suppliers of pipes and tubes that did not respond to our
repeated request for their cost information. These suppliers are [
                                        ]. Specifically, we
used the highest control number- specific variable costs of manufacturing, total
cost of manufacturing, and total cost of production, which are [
                   ], respectively for control number [                ]
produced by [      ]. For the unaffiliated suppliers to which we did not request
their cost information, we used Garg Tube's cost of acquisition of inputs from
those unaffiliated suppliers.

Commerce Preliminary Analysis Memorandum (July 20, 2020), C.R. 84, P.R. 199) ("Preliminary

Analysis Memo"), at 6.

On December 7, 2020, Garg filed its case brief contesting Commerce's decision to rely

on AFA because [      ] did not provide cost information. Garg Case Brief (Dec. 7, 2020), C.R.

89, P.R. 222) at 12-14. Petitioners filed its reply on December 14, 2020. Petitioner Rebuttal Brief

(Dec. 14, 2020), C.R. 92, P.R. 225, at 14-18.

Commerce published its final determination on March 19, 2021. *Final Results*, 86 Fed.

Reg. 14,872. Commerce justified its decision to rely on AFA. IDM at 32-43. Commerce

reasoned:

As stated in the *Preliminary Results*, although Garg Tube sourced pipe and tube
from a number of Indian producers, Commerce limited its request to Garg Tube to

obtain the COP information from certain unaffiliated suppliers, and also subsequently issued direct requests to these same suppliers to provide directly to Commerce the cost information concerning the merchandise they sold to Garg Tube. The suppliers in question refused to provide their COP information either to Garg Tube or directly to Commerce as requested. In the *Preliminary Results*, pursuant to section 776(a)(1) of the Act, we determined that these unaffiliated suppliers' respective cost information is necessary information that is missing from the record. Pursuant to section 776(a)(2)(A)-(C) of the Act, we found that each of the suppliers withheld cost information that was requested by Commerce, failed to provide such information within our deadline, and significantly impeded the review. Further, in the *Preliminary Results*, we found that the suppliers in question, as interested parties to this review, failed to cooperate to the best of their ability in responding to Commerce's separate and repeated requests for information, and that it was appropriate to resort to partial facts available with adverse inferences regarding said suppliers' missing cost information, pursuant to section 776(b) of the Act. Our decision in the *Preliminary Results* to rely on partial AFA for missing cost information from certain unaffiliated suppliers from which Commerce sought COP data is consistent with our practice, under identical circumstances, including the last administrative review of this proceeding.

*Id*. at 37-38 (footnote omitted).

Commerce also agreed with the Domestic Interested Parties' ("DIP") argument as to how

AFA should be calculated:

Lastly, Commerce agrees with the DIP that Commerce should use the production cost data for the product control number with the highest calculated COP after applying the cost-based PMS adjustment to the HRC costs. COPs that do not account for the PMS in the Indian HRC market, and thus do not reflect costs as adjusted for the PMS, would result in a substantial understatement of the COP of pipe and tube produced by Garg Tube's unaffiliated suppliers, and would be counterproductive in deterring future non-cooperation by Garg Tube's unaffiliated suppliers. Further, Commerce's practice on this issue supports the use of a PMS adjusted COP for the unreported COP, in light of the cost-based PMS finding in this review that pertains to such costs in the Indian market.

*Id*. at 43.

Finally, Commerce discussed the reasons why it was not applying AFA to Garg's

unaffiliated vendors to whom it did not send questionnaires:

We disagree with the DIP that Commerce should apply partial AFA to Garg Tube's pipe and tube purchases from *all* unaffiliated pipe suppliers, including the non-examined ones. As a preliminary matter, Commerce has no practice in the

AD proceedings, and the DIP cites none, of applying AFA to entities from which Commerce did not request any information. Commerce is prohibited from reaching a determination under sections 776(a)(2)(A)-(C) of the Act because it cannot find that the non-examined unaffiliated suppliers withheld cost information or significantly impeded the review; subsequently, Commerce is prohibited from reaching a determination under section 776(b) of the Act because these entities cannot be shown to have failed to cooperate by not acting to the best of its ability to comply with a request for information. It is for these reasons that Commerce found in the *Preliminary Results* the following:

For Garg Tube's unaffiliated suppliers of pipes and tubes for which Commerce did not request cost information, such cost information is missing from the record of this review. Accordingly, as neutral facts available for these preliminary results, Commerce has used the reported acquisition costs for pipes and tubes that Garg Tube sourced from the suppliers in question.

We also find no basis in the DIP's claim that Garg Tube is in the position to manipulate which supplier's cost data can be submitted for the benefit of Garg Tube's result. There is no record information that shows which of Garg Tube's suppliers' actual COP may be beneficial or detrimental to Garg Tube's results in this review. Further, Garg Tube is not in the position to control which specific suppliers Commerce will identify for individual examination for purpose of soliciting their COPs.

*Id.* at 42-43.

In its decision to calculate [          ] COP based on AFA, Commerce repeatedly

referenced its decision in AR17/18:

- "Specifically, as we explained in the previous administrative review";

- "Further, as we explained in the previous administrative review";

- "Here, as we found in the previous review";

- "In the previous review, Commerce explicitly found";

- "In this review, as we found previously and reiterated above";

- "Commerce fully explained its approach in the previous review";

- "As it did in the previous review, this explanation supports Commerce's findings in the *Preliminary Results* of this review";

- "Commerce's reliance on partial AFA to calculate the unaffiliated suppliers' costs was in accordance with law. As we explained in the previous review and continue to find here, the controlling judicial precedent for the circumstances at hand is the decision in *Mueller* . . . .";

- "In referencing the explanation that we provided in the previous administrative review, we continue to maintain here that . . .";

- "Similar to our finding in the previous review, on the basis of the above discussion, the application of partial AFA is warranted to the missing suppliers' actual cost information given (1) a substantial portion of POR U.S. sales being represented by the merchandise sourced from the unaffiliated suppliers in question, and 2) the predominant interest in ensuring an accurate calculation of the weighted-average dumping margin for Garg Tube in this review.";
"Here, just as we found previously, concerning inducement considerations envisioned in *Mueller*, it is reasonable to assume that Garg Tube maintained sufficient control over the suppliers in question – it sourced a substantial volume of pipe and tube for Garg Tube's export sales to the United States and (with the exception of one entity that directly exported a small volume of merchandise under consideration to the United States) the record does not suggest that the other two suppliers in question directly exported subject merchandise to the United States.";

- "On the basis of our reasoning adopted from the previous review, we find that using Garg Tube's proxy for unaffiliated suppliers' COPs "would allow the unaffiliated supplier{s} to conceal{their} true production costs of subject merchandise while continuing to sell {it} in the U.S. market by funneling such merchandise through Garg Tube."; and

- "Similar to the rationale we espoused in the previous review, and notwithstanding Garg Tube's efforts to obtain the actual COPs of pipe and tube from the suppliers in question, we find that Garg Tube failed to put forth its maximum efforts in inducing them to cooperate."

*Id*. at 38-41.

In this Civil Action, Garg is challenging Commerce's decision to calculate [     ] cost

of production based on AFA.

## B.    THIS APPEAL AND REMAND PROCEEDINGS

On April 16, 2021, Garg appealed two aspects of the *Final Results* to this Court:

(1) application of partial AFA for uncooperative suppliers; and (2) particular market situation

("PMS") findings and methodology. Summons (Apr. 16, 2021), ECF 1; Complaint (May 14, 2021), ECF 10, ¶¶ 20-27. This Court stayed Garg's challenge to the *Final Results* pending resolution of Garg's appeal to the same two issues in AR17/18. This Court initially invalidated Commerce's partial AFA application in AR17/18 and subsequently affirmed Commerce's remand redetermination that eliminated that partial AFA application. *See Garg I*, 527 F. Supp. 3d at 1371-73; *Garg II*, 569 F. Supp. 3d at 1208-09. This Court also invalidated Commerce's PMS findings and methodology in AR17-18. *Garg Tube Export LLP v. United States*, 600 F. Supp. 3d 1276, 1279-81 (CIT 2022). As a result, Garg's ADD liability in AR17-18 was completely eliminated – and neither Defendant nor Defendant-Intervenors further appealed this Court's AR17/18 determinations. *Welded Carbon Steel Standard Pipes and Tubes from India: Notice of Court Decision Not in Harmony with the Final Results of Antidumping Administrative Review; Notice of Amended Final Results*, 87 Fed. Reg. 65,749, 65,749 (Nov. 1, 2022).

This AR18/19 appeal resumed in February 2023 with Defendant requesting, and this Court granting, a voluntary remand for Commerce to reconsider its PMS decision. Defendant's Consent Motion to Remand Case (Feb. 2, 2023), ECF 43; Order (Feb. 3, 2023), ECF 44 ("Remand Order"). Commerce subsequently issued its Draft Results of Redetermination Pursuant to Court Remand (Feb. 13, 2023), P.R.R. 1 ("Draft Remand"), which recalculated Garg's AR18-19 ADD rate as 8.42% by eliminating the cost-based PMS. Draft Remand at 4-5. Commerce employed its differential pricing analysis, including Cohen's *d*, in recalculating Garg's ADD rate. U.S. Department of Commerce Memorandum (Feb. 13, 2023), C.R.R. 1, P.R.R. 2 ("Draft Remand Calculation Memo"), at 2. Garg submitted comments on the Draft Remand, agreeing with the PMS elimination but challenging Commerce's differential pricing methodology. Letter from GDLSK to U.S. Department of Commerce (Feb. 21, 2023), P.R.R. 3

("Garg Draft Remand Comments"), at 2-9.

Commerce issued its Remand in March 2023, which retained Garg's recalculated 8.42% ADD rate for AR18/19. Remand at 6. Commerce declined to address Garg's substantive challenge to the differential pricing analysis employed in the Remand, finding that: "Garg Tube did not raise this issue either in its administrative case brief before the agency or in its challenge to the *Final Results* before this Court, and this issue was not covered by the Court's *Remand Order*." *Id*. at 7.

## VI.   ARGUMENT

### A.   COMMERCE UNLAWFULLY APPLIED PARTIAL AFA TO GARG BECAUSE OF [          ] FAILURE TO RESPOND TO COMMERCE'S QUESTIONNAIRE

#### 1.   The AR17-18 Litigation

There are no material differences between the factual and legal issues in this Civil Action and the issues before this Court in the AR17/18 litigation. Indeed, as noted above, in its AR18/19 IDM, Commerce repeatedly referenced its AR17/18 analysis as the basis for its AR18/19 decision.

AR17/18 covered the period of review May 1, 2017 through April 30, 2018. *Welded Carbon Steel Standard Pipes and Tubes from India: Final Results of Antidumping Duty Administrative Review; 2017/18*, 85 Fed. Reg. 2715 (Jan. 16, 2020), accompanying IDM ("AR17/18 IDM"). In its AR17/18 IDM, Commerce relied on the same rationale for calculating [   ] costs based on AFA as it did in AR18/19. First, Commerce determined "that the unaffiliated suppliers of pipe and tube are interested parties to this review, within the meaning of section 771(9)(A) of the Act, because they are producers of Indian pipe and tube, which is the merchandise subject to the *Order*." AR17/18 IDM Comment 2. Second, while Garg purchased pipe and tube from multiple unaffiliated vendors who did not provide cost data, Commerce

"limited its request to Garg Tube to obtain the COP information from two unaffiliated suppliers, Company A {[     ]} . . . and Company B, and also subsequently issued direct requests to these same two suppliers to provide directly to Commerce the cost information concerning the merchandise they sold to Garg Tube." *Id*. Third, because these vendors did not submit cost data, Commerce "found that the suppliers in question, as interested parties to this review, failed to cooperate to the best of their ability in responding to Commerce's separate requests for information, and that it was appropriate to resort to partial facts available with adverse inferences regarding said suppliers' missing production cost information, pursuant to section 776(b) of the Act." *Id*. Fourth, Commerce decided that the missing data was essential for Commerce to calculate accurate margins. Fifth, Commerce reasoned that "the controlling judicial precedent for the circumstances at hand is the CAFC's decision in *Mueller*." *Id*. Commerce stated that pursuant to *Mueller*:

> Commerce is not barred, under appropriate circumstances, "from drawing adverse inferences against a non-cooperating party that have collateral consequences for a cooperating party," or from relying on inducement or deterrence considerations in determining a dumping margin for a cooperating party "**as long as the application** of those policies **is reasonable on the particular facts and the predominant interest in accuracy** is properly taken into account."

*Id*. (quoting *Mueller Commercial de Mexico, S. de R.L. de C.V. v. United States*, 753 F.3d 1227, 1233 (Fed. Cir. 2014)).

Sixth, with respect to the relevant "inducement or deterrence considerations" Commerce noted that "it was reasonable to assume that Garg Tube maintained sufficient control over the suppliers in question because it sourced a substantial volume of pipe and tube, particularly from Company A, for Garg Tube's export sales to the United States." AR17/18 IDM Comment 2.

Finally, Commerce found that Garg did not act to the best of its ability to obtain information from these vendors:

Although Garg Tube claims to have made extensive efforts to obtain the actual COPs of pipe and tube purchased from Company A and, to a lesser extent, from Company B, we find that Garg Tube failed to put forth its maximum efforts in inducing the suppliers in question to cooperate by providing the COP information Commerce requested of them. . . .

In this regard, Garg Tube's communications with Company A and Company B, documented on the record, do not bear out Garg Tube's definitive and formal intent to sever all future business with the suppliers in question, for their failure to provide the COP information requested by Commerce. Garg Tube's communications only held out a possibility, rather than a certainty or near-certainty, of a future loss of business.

*Id.* Commerce summarized its rationale as follows:

Accordingly, we determine that Garg Tube's efforts, documented on the record, did not serve as a strong inducement for the suppliers in question to cooperate and, therefore, Garg Tube did not act to the best of its ability in attempting to obtain the suppliers' costs. Importantly, contrary to Garg Tube's assertion, the application of partial AFA to Garg Tube has a direct effect on the suppliers in question, precisely because they do not conduct business directly within the United States. This is so, because any hinderance to Garg Tube's export sales to the United States, caused by the increase in its antidumping duty liability, adversely affects Garg Tube's purchases from the suppliers and, thus, the suppliers' continued ability to sell their merchandise to Garg Tube for its export sales to the United States. Based on this, the record evidence supports a finding that the application of partial AFA to Garg Tube may induce cooperation by the Garg Tube suppliers in future segments and induces the respondent to source from suppliers who will cooperate with Commerce's request for suppliers' actual COP information.

*Id.*

In *Garg I*, decided July 9, 2021 – two months after Commerce's final decision in AR18/19 – this Court rejected Commerce's rationale. 527 F. Supp. 3d at 1373-74. This Court initially reasoned that pursuant to *Mueller*, Commerce, in appropriate circumstances, could incorporate adverse inferences against a cooperative respondent because of the failure of another

party to co-operate to the best of its ability. *Id.* at 1372. This Court then discussed these circumstances as follows:

> Commerce sought to incorporate adverse inferences against a cooperative respondent under the theory that the cooperative respondent could have induced the cooperation of a supplier that was also a mandatory respondent to the proceeding. *Id.* at 1229–30. The Court of Appeals concluded that Commerce may invoke such rationales under 19 U.S.C. § 1677e(a) but must balance its consideration against its obligation to calculate an accurate dumping margin. *Mueller*, 753 F.3d at 1232–36. If Commerce seeks to induce the cooperation of a non-cooperating supplier through a cooperating party, there must be, for example, substantial evidence that the cooperating party has leverage over the non-cooperating supplier, and that if Commerce is constrained from employing adverse inferences, the non-cooperating party will have an incentive to evade duties by selling merchandise into the United States through the cooperating party.

*Id.*

    This Court held that remand was warranted because  "it is not discernible from Commerce's analysis how it is applying 19 U.S.C. § 1677e in this instance." *Id.* This Court explained this confusion as follows:

> Commerce cites *Mueller* as "controlling judicial precedent for the circumstances at hand {.}" *Id.* at 39; *see also*, *id.* at 40 (stating that Commerce's rationale rests on findings in *Mueller*). However, *Mueller* governs Commerce's incorporation of adverse inferences under subsection (a), not subsection (b). *See Mueller*, 753 F.3d at 1232–36. Yet, Commerce later invokes the wording of 19 U.S.C. § 1677e(b) when observing that "{Garg} did not act to the best of its ability in attempting to obtain the suppliers' costs." {17/18 IDM} at 41. It is unclear whether this statement indicates that Commerce is applying § 1677e(b) against the unaffiliated supplier, against Garg, or whether Commerce here acts pursuant to some other interpretation of 19 U.S.C. § 1677e(b). The court cannot discern Commerce's analytical pathway, and thus Commerce's final determination cannot be sustained.

*Id.*

This Court then reasoned that "to the extent that Commerce applies 19 U.S.C. § 1677e(a) against Garg, Commerce must do more to support its determination. *Id*. Commerce states that a partial AFA rate "'potentially induces the cooperation'" of Garg's unaffiliated supplier." *Id*. (quoting 17/18 IDM at 41). This Court continued:

> Insofar as Commerce seeks to apply 19 U.S.C. § 1677e(b) to Garg, Commerce simply does not explain whether it is finding that Garg was an uncooperative party during the administrative review. It may be that Commerce's finding that Garg "failed to put forth its maximum efforts in inducing the suppliers in question to cooperate" is the basis for applying AFA against Garg. See {17/18 IDM} at 41. However, since Commerce discusses Garg's efforts in the context of applying *Mueller*'s framework, the court cannot say that it is reasonably discernible either way. *Id.* If Commerce means to apply § 1677e(b), it must indicate whether Garg was a cooperative respondent, and support any such determination with substantial evidence. Commerce's final determination is remanded for further explanation or reconsideration.

*Id.* at 1373 (footnote omitted).

On remand, Commerce "under respectful protest" modified its "calculations for Garg Tube by relying on neutral facts available to fill the gap in the COP data caused by the supplier's non-cooperation." *AR17/18 Redetermination* at 3. This decision was based on Commerce's conclusion that "we are unable to demonstrate on the record of this review that Garg Tube has sufficient 'market power' or 'leverage' over its unaffiliated supplier to induce the supplier's cooperation." *Id*. In reaching this conclusion, Commerce:

> "clarify{ied} at the outset that Commerce is not drawing an adverse inference against Garg Tube. Rather, Commerce finds (consistent with *Mueller*) that [ ] is an interested party within the meaning of section 771(9)(A) of the Act that withheld necessary information (*i.e.*, its actual COP), failed to provide such information within the established deadline, and significantly impeded the review within the meaning of sections 776(a)(1) and (a)(2)(A)-(C) of the Act. We also continue to find that [    ] has failed to cooperate to the best of its ability in responding to Commerce's requests for information within the meaning of section 776(b) of the Act.

*Id*. at 18. Commerce concluded:

PUBLIC VERSION

We reviewed the record evidence in light of the standard articulated by the CIT in its *Remand Order* and find that we are unable to identify substantial record evidence to support a determination that Garg Tube possessed market power or leverage over [     ].

Therefore, we are unable to demonstrate that Garg Tube possessed leverage over [     ] given that Garg Tube was not able to successfully induce [       ] cooperation despite multiple attempts to do so and despite threatening to sever business ties with the supplier.

*Id*. at 19. Commerce also noted that:

{A}s this is the first review where Commerce individually examined Garg Tube, we do not have the privilege of time in accumulating evidence of a "long-term" relationship between Garg Tube and [     ] that potentially gives rise to leverage. As such, we are limited in the conclusions that we can draw from the available record evidence precisely because of the supplier's non-cooperation.

*Id*. at 21. This Court affirmed:

Commerce clarifies that it is relying on 19 U.S.C. § 1677e(a) to determine the missing cost of production data from the Unaffiliated Supplier because the Unaffiliated Supplier is an interested party as defined by 19 U.S.C. § 1677(9)(A). Remand Results 3, 17–22. Commerce explains that it relies on neutral facts available because it is unable to support a determination that Garg possesses sufficient "market power" or "leverage" to induce the cooperation of the Unaffiliated Supplier with substantial evidence. *Id.* at 17–19. Commerce has complied with the remand order and no party objects to its decision; therefore, its determination is sustained

*Garg II*, 569 F. Supp. 3d at 1209 (emphasis added).

## 2.    This Court Should Follow Its AR17/18 Precedent

As discussed above, in *Garg II*, Commerce concluded, albeit under respectful protest, that it was "unable to identify substantial record evidence to support a determination that Garg Tube possessed market power or leverage over [     ]." *Id.* This Court then held that Commerce's decision "complied with the remand order."  In its remand order, this Court had reasoned:

PUBLIC VERSION

> If Commerce seeks to induce the cooperation of a non-cooperating supplier
> through a cooperating party, there must be, for example, substantial evidence that
> the cooperating party has leverage over the non-cooperating supplier, and that if
> Commerce is constrained from employing adverse inferences, the non-
> cooperating party will have an incentive to evade duties by selling merchandise
> into the United States through the cooperating party.

*Garg I*, 527 F. Supp. 3d at 1372.

In *Risen Energy Co. v. United States,* this Court applied the same rationale to the facts in

that case:

> The court remanded Commerce's application of facts available with an adverse
> inference for reconsideration or additional explanation. *Risen I*, 569 F. Supp. 3d at
> 1335. Specifically, Commerce failed to demonstrate that Risen and Trina did not
> put forth the maximum effort to provide full and complete responses to inquiries
> from Commerce. *Id.* Commerce also failed to demonstrate that Risen and Trina
> have leverage to induce their non-cooperative unaffiliated suppliers to cooperate,
> that the non-cooperative unaffiliated supplies are evading their own duties by
> exporting subject merchandise through Risen or Trina, or that using the highest
> factor of production consumption rates on the record results in an accurate
> dumping margin.

611 F. Supp. 3d 1384, 1391 (CIT 2022),

In *Venus Wire Indus. Pvt. Ltd. v. United States*, this Court's analysis tracked the analysis

in *Garg I* and *Risen*:

> Here, record evidence suggests that Venus's ability to induce cooperation from its
> largest supplier was unsupported by any need for that company to evade its own
> higher dumping margin. Final Analysis Mem. at 2; *cf. Mueller*, 753 F.3d at 1235
> (noting the "possibility that Ternium could evade its own AFA rate of 48.33
> percent by exporting its goods through Mueller if Mueller were assigned a
> favorable dumping rate"). Commerce failed to account for this evidence that fairly
> detracted from its determination that Venus "could have done more to induce its
> suppliers to cooperate."

471 F. Supp. 3d 1289, 1311 (CIT 2020) (footnote omitted).

In *Itochu Building Products Co. v. United States*, this Court explained the rationale upon which Commerce should rely in these cases:

> The Federal Circuit . . . cautioned that, in using AFA to compute the margin of a cooperating party, 'Commerce cannot confine itself to a deterrence rationale and also must carry out a case-specific analysis of the applicability of deterrence and similar policies,' and also should evaluate if there is a 'direct adverse effect' on the non-cooperating party.

2017 WL 2703810 (CIT June 22, 2017), *15-16 (quoting *Mueller*, 753 F.3d at 1234, 1236).

On remand, Commerce substituted neutral facts available in place of its prior reliance on AFA and the *Itochu* Court affirmed:

> Mid Continent's argument that Jinchi had sufficient control over its supplier simply because it had an ongoing business relationship with the supplier, . . . is unpersuasive. Under such a standard, it would be impossible to separate respondents who have control from those that do not. Mid Continent's assertion that . . . , as a rational business, would supply the records upon inducement by Jinchi ignores . . . lack of proper accounting and small size.

*Itochu Bldg. Prods. Co. v. United States*, 2018 WL 1445676, *10 (CIT Mar. 22, 2018) (quoting *SKF USA Inc. v. United States*, 630 F.3d 1365, 1375 (Fed. Cir. 2011)) (emphases added).

In *Canadian Solar Int'l Ltd.  v. United States*, this Court expressly rejected Commerce's argument that "because the suppliers failed to cooperate by not providing the FOP information, 19 U.S.C. § 1677e(a) and (b) permit Commerce to apply AFA to account for the missing information." 378 F. Supp. 3d 1292, 1316 (CIT 2019). This Court reasoned that "a close reading of section 1677e(b) and *Mueller* reveals that application of an inference adverse to the interests of a cooperating respondent under subsection (b) is not contemplated by the statute nor the Court of Appeals." *Id*. at 1318.

On remand, Commerce reaffirmed its decision to apply AFA and this Court again reversed. *Canadian Solar Int'l Ltd. v. United States*, 415 F. Supp. 3d 1326, 1332–35 (CIT 2019). First, this Court reasoned that Commerce had ignored the teaching in *Mueller*, by "fail{ing} to

25

explain why the alternative—here, using an average of reported usage rates—would not better promote accuracy." *Id*. at 1334 (citing *Mueller*, 753 F.3d at 1233). This Court then reasoned that Commerce failed to use a reasonable standard: "Evidence of a potential stake in the respondent having a lower dumping margin does not demonstrate a threat of duty evasion here." *Id*. at 1334-35 (emphasis added).

In *SolarWorld Ams.*, *Inc. v. United States*, under similar factual circumstances, this Court affirmed Commerce's decision to rely on neutral facts available for the missing data of a respondent's uncooperative tollers, noting that "Suntech documented its unsuccessful efforts to obtain the requested data from its tollers." 234 F. Supp. 3d 1286, 1312 (CIT 2017); *see Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China*, 77 Fed. Reg. 63,791 (Oct. 17, 2012) (final determination).

The reasoning in these decisions is similar to this Court's analysis in *Garg I* and lend further support to our opinion that Commerce's decision in *Garg II*, at the very least, should be remanded for further consideration. Moreover, we also submit that the record in the AR18/19 litigation, in light of Commerce's *AR17/18 Redetermination*, is sufficiently clear for this Court to conclude that Commerce's decision rests on the failure of [      ] to act to the best of its ability, regardless of Garg's actions. Assuming that this Court agrees, it should then hold that the record in AR18/19 does not contain "substantial evidence" that Garg "has leverage over"        [      ], and "that if Commerce is constrained from employing adverse inferences, {[      ]} will have an incentive to evade duties by selling merchandise into the United States through {Garg}."

Indeed, the AR18/19 record does not contain any evidence that Garg has leverage over [      ] or any evidence that {[      ]} will have an incentive to evade duties by selling merchandise into the United States through Garg. In its *AR17/18 Redetermination*, Commerce

agreed that no such evidence existed based on the AR17/18 record, and in its AR18/19 IDM,

Commerce repeatedly stated that its analysis was identical to its analysis in AR17/18.  In

AR18/19 Garg advised Commerce that:

> Garg Tube's supplier, [                              ], lacks prior experience, institutional
> capacity and business motivation (it has no direct exports to USA) to cooperate
> with Commerce's extensive cost data requirement.

> Applying AFA to Garg Tube won't have any direct adverse effect on supplier,
> since it does not have any direct business with the USA.

> Garg Tube has insufficient leverage over [                              ].

> Garg Tube has provided all evidence of all of its communications with [          ].

SQR at 41.

Moreover, any additional threat by Garg would have fallen on deaf ears, since Garg

lacked sufficient market power to force [        ] to provide the data. Garg expressly advised

Commerce that market power did not exist, and Garg's statement is fully supported by this

Court's decision in *Garg I*, Commerce's Remand Determination which was affirmed in *Garg II,*

and the record in AR18/19 as to Garg's purchases. As discussed above, the record reveals that

[     ] was one of many vendors selling subject merchandise to Garg and that Garg self-

produced significantly more subject merchandise than it purchased. The record also establishes

that [      ] does not itself export subject merchandise to the United States. Thus, as was the case

in AR17/18, there is no record evidence that Garg has sufficient market power to persuade

[     ] to cooperate and no record evidence that [     ] has an incentive to evade duties by

selling merchandise into the United States through Garg.

In light of these facts, this Court should hold that Commerce cannot rely on AFA to

calculate [         ] costs and that the best information as to whether Garg was selling

merchandise below cost – and whether Garg's sales prices to the United States were above

Garg's CV – is found in Garg's own data.

**B.    THE REMAND IMPROPERLY EMPLOYED COMMERCE'S DIFFERENTIAL PRICING METHODOLOGY**

On remand, Commerce stated that "based on the results of the differential pricing

analysis, Commerce finds that 66.01 percent of the value of U.S. sales pass the Cohen's *d* test,

and confirms the existence of a pattern of prices that differ significantly among purchasers,

regions, or time periods." Draft Remand Calculation Memo at 2.

As discussed below, Commerce's reliance on the Cohen's *d* test was contrary to law.

Commerce is allowed to rely on Cohen's *d* only when certain specific conditions are satisfied.

Since Garg's U.S. sales database does not satisfy those conditions, Commerce was precluded

from applying Cohen's *d* to Garg's U.S. sales, and accordingly, should have relied on an average

to average ("A-A") methodology, rather than an average to transaction ("A-T") methodology, to

calculate Garg's dumping margin.

**1.    Commerce Failed to Show that Garg's U.S. Sales Satisfy the Statutory Criteria for Applying the Cohen's *d* Test**

U.S. law prioritizes reliance on A-A, rather than A-T to calculate dumping margins. 19

U.S.C. § 1677f-1(d)(1)(A); *see* 19 C.F.R. § 351.414(c)(1) ("In an investigation or review, the

Secretary will use the average-to-average method ***unless*** the Secretary determines another

method is appropriate in a particular case.") (emphasis added). Commerce may resort to the

statutory exception and rely on A-T ***only if*** "there is a pattern of export prices (or

constructed export prices) for comparable merchandise that differ significantly among

purchasers, regions, or periods of time. . . ." 19 U.S.C. § 1677f-1(d)(1)(B).

In *Stupp Corp. v. United States*, the Federal Circuit remanded to Commerce for further consideration its decision to rely on the Cohen's *d* test to determine whether a respondent has engaged in targeted dumping. The CAFC reasoned:

> {W}hile Commerce's decision to consider applying the average-to-transaction method is within its discretionary power, its determination of whether the average-to-transaction method is appropriate in a particular case is not solely within its discretion, because that determination is confined by the statutory language of 19 U.S.C. § 1677f-1(d)(1)(B): (i) there must be a 'pattern of export prices . . . that differ significantly among purchasers, regions, or periods of time,' and (ii) Commerce must 'explain{ } why such differences cannot be taken into account' using the average-to-average method.

5 F.4th 1341, 1351-52 (Fed. Cir. 2021).[4] The CAFC continued:

> We agree that there are significant concerns relating to Commerce's application of the Cohen's *d* test in this case and, more generally, in adjudications in which the data groups being compared are small, are not normally distributed, and have disparate variances."

*Id*. at 1341, 1356-1357.

*Stupp* held that in order for the Cohen's *d* test to reliably determine the "effect sizes" of the price comparisons, which Commerce uses to determine whether differences in prices are "significant", a dataset must fulfill three key preconditions. These preconditions are: (1) there must be an adequate number of observations on which the test is performed ("numerosity of data"); (2) the distribution of the data must be normal ("normality of distribution"); and (3) the variances of the test and comparison groups must be reasonably homogeneous ("homoscedasticity or "homogeneity of variances"). Citing Professor Cohen, *Stupp* emphasized the importance of these three criteria: "'we maintain the assumption that the populations being compared are normal and with equal variability, and conceive them further as equally

---

[4] Garg acknowledges that upon review of Commerce's redetermination, this Court held that "Commerce has adequately explained how its methodology is reasonable." *Stupp Corp. v. United States,* 619 F. Supp. 3d 1314, 1328 (CIT 2023).

numerous.'" *Id*. at 1341, 1357 (Fed. Cir. 2021) (quoting Jacob Cohen, *Statistical Power Analysis for the Behavioral Sciences* (2d ed. 1988), at 21).

Regarding the *numerosity of data* criteria, *Stupp* held that "{t}he use of Cohen's *d* with test groups consisting of very few observations may be particularly problematic." *Id.* at 1358. Based on a hypothetical scenario in which the number of observations in the test group and comparison groups were small, *Stupp* found that "{t}he literature concludes that using Cohen's *d* in such a situation {involving a small number of observations in those groups} may produce an upward bias in the calculated effect size." This, in turn, "might produce more 'passing' results under the Cohen's *d* test, *which would tend to exaggerate dumping margins*." *Id.* at 1359 (emphasis added).

Regarding the *normality of distribution* criteria, *Stupp* quoted from a treatise that explained that "'{w}hen the distribution of scores of a comparison population is not normal, the usual interpretation of a *d*G or *d* in terms of estimating the percentile standing of the average-scoring members of another group with respect to the supposed normal distribution of the comparison group's scores would be invalid.'" *Id.* (quoting Robert J. Grissom & John J. Kim, *Effect Sizes for Research*: *Univariate and Multivariate*, at 66 (2d ed. 2012)).  That treatise further explained that, because standard deviations – on which Commerce's Cohen's *d* test is based – "can be very sensitive to a distribution's shape, . . . *nonnormality can greatly influence the value of a standardized- mean-difference effect size and its estimate*." *Id.* (quoting Grissom & Kim at 66) (emphasis added).

Regarding the *homogeneity of variances* criteria, *Stupp* quoted from a study that "concluded that Cohen's *d* 'was found to be inaccurate when the normality and homogeneity-of- variances assumptions were violated . . . , *thereby severely affecting the accuracy of* d *in*

*evaluating the true {effect size} in the research literature.'" Id.* at 1358 (quoting Johnson Ching-Hong Li, *Effect size measures in a two-independent- samples case with nonnormal and nonhomogeneous data*, 48 Behavioral Research 1560, 1571 (2015)).

*Stupp* also rejected the only two arguments presented by Commerce: (1) the Department "need not . . . worry about normality, because it is not sampling data but instead possesses the entire universe of data"; and (2) "its approach is reasonable because it uses the larger, more conservative 0.8 cutoff for identifying effect sizes that pass the Cohen's *d* test." *Id*. at 1359-60. With respect to Commerce's distinction between analyzing sampled data and an entire universe of data, the CAFC reasoned that although the Department does not "sample" data, "that observation does not address the fact that Professor Cohen derived his interpretive cutoffs under the assumption{s} of normality . . . , homogeneity-of-variances and the number of observations being compared." *Id*. at 1360. With respect to Commerce's reliance on a 0.8 cutoff, the CAFC reasoned that this reliance "fails to address the fact that Professor Cohen derived his interpretive cutoffs under certain assumptions," and "{v}iolating those assumptions can {result in} a meaningless comparator." *Id.* at 1360.

In *Nexteel Co. v. United States*, the Federal Circuit also found that Commerce's methodology was flawed "because Commerce's use of Cohen's *d* here presents identical concerns to those in *Stupp*." 28 F.4th 1226 (Fed. Cir. 2022). After Commerce issued its redetermination, the CIT ordered another remand "for reconsideration or further discussion the issue of Commerce's calculation and application of the 0.8 threshold in Cohen's *d* analysis," and "for reconsideration of the academic literature cited in the Final IDM." *Nexteel Co. v. United*

*States,* 633 F. Supp. 3d 1190, 1203 (CIT 2023).[5]

In sum, *Stupp* and *Nexteel* require that Commerce establish that the sales data underlying the test and comparison groups satisfy all three preconditions – numerosity of data, normality of distribution and homogeneity of variances – before applying the Cohen's *d* test.

Commerce's cursory treatment of differential pricing methodology in the Remand is devoid of any analysis as to these threshold preconditions. This failure to examine the dataset means that Commerce's "targeted dumping" analysis would generate correct results only by happenstance – *i.e.*, only if the unexamined data are accidentally distributed in a way that satisfies the preconditions for the proper application of the Cohen's *d* test. As such, the Remand is flawed, because Commerce failed to analyze, much less demonstrate, whether Garg's pricing data satisfy the conditions for the Cohen's *d* test to be considered valid.

In sum, Commerce should not subject Garg's sales to the Cohen's *d* test without first analyzing the data to determine if the three linchpins of Cohen's *d* are satisfied. As Commerce's Remand did not conduct this analysis, and/or did not find that Cohen's *d* applies, Commerce must recalculate Garg's dumping margin based on A-A.

### 2.     Garg Exhausted its Administrative Remedies by Challenging Differential Pricing in the Draft Remand

Commerce declined to address Garg's substantive challenge to the differential pricing analysis employed in the Remand, finding that: "Garg Tube did not raise this issue either in its

---

[5] Garg acknowledges that in *Marmen Inc. v. United States*, 627 F. Supp. 3d 1312, 1322 (CIT 2023), this Court held that "Commerce's use of the Cohen's *d* test applied as a component of its differential pricing analysis is in accordance with law." A similar result was reached by this Court in *SeAH Steel Corp. v. United States,* 619 F. Supp. 3d 1309, 1313 (CIT 2023), *appeal dismissed in part,* No. 2023-1109, 2023 WL 3244018 (Fed. Cir. May 4, 2023), and *dismissed,* No. 2023-1657, 2023 WL 3316548 (Fed. Cir. May 9, 2023) ("The concerns described in Stupp that might be raised when the Cohen's *d* test is applied to samples are inapplicable because in this case, Commerce applied the Cohen's *d* test to a population.")

administrative case brief before the agency or in its challenge to the *Final Results* before this

Court, and this issue was not covered by the Court's *Remand Order*." *Id*. at 7. This conclusion is

wrong. Commerce in fact applied its differential pricing methodology when recalculating Garg's

ADD rate on remand. Draft Remand Calculation Memo at 2. The CAFC recognizes that, with

respect to issues raised on remand, a party must "raise the issue **at the appropriate time on**

**remand**" in order "to exhaust its administrative remedies before Commerce." *Mittal Steel Point*

*Lisas Ltd. v. United States*, 548 F.3d 1375, 1384 (Fed. Cir. 2008) (emphasis added). Garg

appropriately challenged Commerce's differential pricing analysis after it was employed in the

Draft Remand – *i.e.*, "at the appropriate time on remand." *Id*. While Commerce claimed that the

differential pricing analysis was beyond the scope of the remand order, this Court merely ordered

remand without opining with respect to differential pricing. *See* Remand Order. By applying its

differential pricing analysis to recalculate Garg's ADD rate on remand, Commerce made that

action subject to judicial review irrespective of whether it had earlier been challenged during the

initial calculation of Garg's AR18-19 ADD rate. Draft Remand Calculation Memo at 2.

Moreover, the Cohen's *d* issue raised by Garg on remand falls squarely within recognized

exceptions to the exhaustion doctrine. Garg filed its Summons in this Civil Action on April 16,

2021, ECF 1, and its Complaint one month later on May 14, 2021, ECF 10. At that time, the law

regarding Cohen's *d* appeared to have been settled, as the courts had consistently affirmed

Commerce's reliance on this test to determine whether a respondent was engaged in targeted

dumping. *See, e.g.*, *Dillinger France S.A. v. United States*, 981 F.3d 1318, 1326 (Fed. Cir. 2020)

("We see no error in Commerce's determination."); *Apex Frozen Foods Priv. Ltd. v. United*

*States*, 862 F.3d 1337, 1348 (Fed. Cir. 2017) ("We hold that Commerce's meaningful difference

analysis—comparing the ultimate antidumping rates resulting from the A-A methodology,

without zeroing; and the A-T methodology, with zeroing—was reasonable.").

Then, on July 15, 2021, the Federal Circuit issued its decision in *Stupp*. At that time, a previously settled principle – that Cohen's *d* conformed to law – was called into question by an intervening Federal Circuit decision.  Prior to *Stupp,* it would have been futile for a respondent to frontally attack Cohen's *d*. Moreover, the issues raised in *Stupp* constitute pure questions of law, which do not require Commerce or the parties to evaluate the record in Garg's appeal.

Thus, Garg was not required to raise its Cohen's *d* issue before Commerce prior to challenging Cohen's *d* in this Court. *See Papierfabrik Aug. Koehler AG v. United States,* 36 CIT 1632, 1635 (2012) ("Here, the intervening judicial decision exception applies because there was a change in the controlling law on the use of zeroing."); *Siemens Gamesa Renewable Energy v. United States*, 621 F. Supp. 3d 1337, 1348 (CIT 2023) ("the CAFC's opinion in *YC Rubber* interpreted a statutory provision, 19 U.S.C. § 1677f-1(c)(2), in a way that was directly contrary to the statutory interpretation Commerce applied in this case to limit its individual examination to a single respondent."); *Itochu Bldg. Prod. v. United States*, 733 F.3d 1140, 1146 (Fed. Cir. 2013) ("The affirmatively stated basis for Commerce's ruling, moreover, together with Commerce's contemporaneous in-court elaboration of its position on the issue, strongly suggests that a resubmission by Itochu would have been futile."); *Agro Dutch Indus. Ltd. v. United States*, 508 F.3d 1024, 1029 (Fed. Cir. 2007) ("We conclude that the court below did not abuse its discretion in finding that Agro's argument regarding the proper interpretation of § 1675(a)(4) presents a "pure question of law" that can be addressed on appeal despite Agro's failure to raise such an argument in the proceedings before Commerce.")

For these reasons Commerce erred by failing to address Garg's substantive comments challenging differential pricing. *See* Garg Draft Remand Comments at 2-9. With respect to the

differential pricing analysis that it employed on remand, Commerce, neglected to "explain why it has exercised its discretion in a given manner.'" *Motor Vehicle Mfgrs. Ass'n.*, 463 U.S. at 48. And, as discussed above, Commerce committed substantive legal error by using its flawed differential pricing analysis when recalculating Garg's AR18-19 ADD rate on remand.

### 3. Commerce's Method for Determining the Denominator in the Cohen's *d* Test Is Unreasonable and Unsupported by Substantial Evidence

A key element of Commerce's Cohen's *d* formula is the denominator – and in particular, its use of a simple average of the comparison group's and the test group's standard deviations (*i.e.*, σp in the denominator of the Cohen's *d* formula provided below):[6]

$$\frac{|Mc - Mt|}{\sigma p}$$

where  Mc = the mean of the comparison group;
Mt = the mean of the test group; and

σp = the simple average of the two groups' standard deviations.

*Stupp*, 5 F.4th at 1346. In *Mid Continent Steel & Wire, Inc. v. United States*, the CAFC explained:

> Commerce recognized that the function of the denominator in the Cohen's *d* coefficient is to be a "yardstick to gauge the significance of the difference of the means" of the sales prices of the test and comparison groups. . . The numerator of Cohen's *d* is the difference in weighted average sales prices between the test and comparison groups. Without further context, *i.e.*, without a basis for comparison, it is impossible to say whether that difference is "significant," under 19 U.S.C. § 1677f-1(d)(1)(B)(i) or otherwise.

*Mid Continent Steel & Wire, Inc. v. United States*, 31 F.4th 1367, 1377 (Fed. Cir. 2022).

In calculating the denominator (*i.e.*, the "yardstick"), however, Commerce's use of a simple average, as opposed to a weighted average, generates a distortive output and undermines the validity of Cohen's *d* test results. The CAFC reasoned:

---

[6] This term is also referred to as the "pooled standard deviation." *See Mid Continent Steel & Wire, Inc. v. United States*, 31 F.4th 1367, 1377-81 (Fed. Cir. 2022).

> In implementing a statutory mandate, an agency is not duty-bound to follow
> published literature when, *e.g.*, the literature is inapplicable to the specific problem
> before the agency or is not itself well grounded. But here Commerce embraced the
> Cohen's *d* statistics measure and relied on the literature for that measure in making
> its statutory significance assessment . . . . In this situation, Commerce needs a
> reasonable justification for departing from what the acknowledged literature
> teaches about Cohen's *d*.

*Mid Continent*, 31 F.4th at 1381 (citation omitted).

Further, after evaluating Commerce's justifications, the CAFC rejected the "depart{ure}"

from the statistical literature's "teachings about how to calculate the denominator of Cohen's *d*,

specifically in deciding to use the simple averaging when the {test and comparison} groups

differ in size," and found that Commerce's "explanations for doing so fail to meet the

reasonableness threshold." *Id.* at 1381; *see Mid Continent Steel & Wire, Inc. v. United States*, 628

F. Supp. 3d 1316, 1326 (CIT 2023) ("As the Court of Appeals found in *Mid Continent V*,

Commerce's claim that academia supports the simple average appears to be contradicted by the

literature itself. If Commerce continues to rely on the academic literature to support its

methodology, it must further explain why its choice of the simple average is reasonable in light

of this inconsistency. The matter is remanded to Commerce for further explanation or

reconsideration.")

The same applies in Garg's case. Commerce provided no explanation at all – much less,

one that would justify its departure from the teachings in the statistical literature - regarding the

calculation of the Cohen's *d* coefficient. Therefore, Commerce's Remand unlawfully declined to

use, in the denominator for each Cohen's *d* calculation, either: (i) the standard deviation for the

entire CONNUM-specific universe of U.S. sales; or (ii) the weighted average pooled standard

deviations for the test and comparison groups of export sales.

## VII.   <u>CONCLUSION</u>

For the foregoing reasons, Garg respectfully requests that this Court remand the *Final Results* and Remand for reconsideration by Commerce.

Respectfully submitted,

 */s/ Ned H. Marshak*
Ned H. Marshak
Dharmendra N. Choudhary
Jordan C. Kahn

GRUNFELD, DESIDERIO, LEBOWITZ,
SILVERMAN & KLESTADT LLP
599 Lexington Ave., 36th Floor
New York, New York 10022
(212) 557-4000
**
1201 New York Ave., NW, Suite 650
Washington, DC 20005
(202) 783-6881

*Counsel for Plaintiffs Garg Tube
Export LLP and Garg Tube Limited*

Dated: July 31, 2023

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Chamber Procedure 2(B)(1), the undersigned certifies that this brief complies with the word limitation requirement. The word count for Plaintiffs' Memorandum of Law In Support of Rule 56.2 Motion, as computed by Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt's word processing system Microsoft Word, is 12,335, words, plus an embedded graphic with 41 words, for a total of 12,376 words – less than the 14,000 word limit.

/s/ *Jordan C. Kahn*
*Counsel for Plaintiffs Garg Tube*
*Export LLP and Garg Tube Limited*

Dated: July 31, 2023